**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**AT KANSAS CITY**

| | | |
|---|---|---|
| **RODNEY MARSHALL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No.:** |
| **v.** | ) | |
| | ) | |
| **THE BOARD OF COUNTY** | ) | |
| **COMMISSIONERS OF THE COUNTY** | ) | **REQUEST FOR JURY TRIAL** |
| **OF LEAVENWORTH, d/b/a** | ) | |
| **LEAVENWORTH COUNTY** | ) | |
| **PUBLIC WORKS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

Serve:  Board of County Commissioners of Leavenworth County
300 Walnut Street
Leavenworth, Kansas 66048

## COMPLAINT

COMES NOW Plaintiff, Rodney Marshall, and for his cause of action against the above-named Defendant, alleges and states as follows:

1.     Plaintiff is an African-American male and, at all times set forth below was, a resident of the State of Kansas.

2.     Defendant is a political subdivision (municipality) of the State of Kansas, organized under the laws of Kansas, with its county seat in Leavenworth, Kansas.

3.     This case involves four intentional torts:

a.     Wrongful discharge in violation of public policy for exercising worker's compensation rights, in violation of Kansas common law;

b.     Employment discrimination based on race, in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2 *et seq.*;

1

      c.      Creating and maintaining a hostile work environment in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2 *et seq.*; and

      d.      Retaliation for opposing actions which violated Title VII of the Civil Rights Act, in violation of the same.

4.      Defendant employed more than 15 employees in 2020, 2021, and does so currently.

5.      Defendant works in an industry affecting interstate commerce in that it maintains roadways which are used to transport materials into and out of Kansas.

6.      Defendant is thus an "employer" pursuant to U.S.C. § 2000e(b).

7.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as Counts II - IV of Plaintiff's Complaint arise under the laws of the United States, specifically Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 *et seq.*

8.      This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Count I of Plaintiff's Complaint as that count is so related to the claims encompassed within Counts II - IV as to form one case or controversy.

9.      On December 22, 2021, Plaintiff sent written notice of this claim to Defendant, substantially complying with the requirements of Kansas Tort Claims Act, particularly K.S.A. 12-105b (2021).

10.      Specifically, the document sent to Defendant identified Plaintiff's name; Plaintiff's attorneys' names and address; a statement of facts laying out Plaintiff's claim as outlined below; the names of public officers involved, and the addresses of such officers then known to Plaintiff; a statement of the injuries suffered; and a demand of $500,000.

11.     On April 21, 2022, 120 days passed, and Defendant did not accept Plaintiff's claim in any part.

12.     Plaintiff is bringing this action within 90 days of April 21, 2022.

13.     Plaintiff has thus complied with the Kansas Tort Claims Act.

14.     On or about August 2, 2021, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that Defendant engaged in the discriminatory and retaliatory actions that are being raised in this lawsuit, or alternatively, all conduct alleged herein would have arisen from the investigation of such Charge of Discrimination.

15.     On or about April 19, 2022, the United States Department of Justice, having received the matter from the EEOC, issued Plaintiff a Notice of Right to Sue and thereby closed the administrative matter associated with the Charge of Discrimination.

16.     Plaintiff has fulfilled all conditions precedent to the bringing of these claims and has duly exhausted all administrative procedures prior to instituting this lawsuit in accordance with the law.

## FACTS COMMON TO ALL COUNTS

17.     Plaintiff began working for Defendant on or about February 4, 2020.

18.     Plaintiff worked as an Equipment Operator in the Public Works Department but was regularly required to provide auxiliary services in support of other equipment operators.

19.     A few days after starting work, Plaintiff got a brief opportunity to operate a front loader.

20.     Plaintiff was learning to use the machine and was loading a dump truck with

dirt.

21.      After a few minutes of loading the dirt, a coworker, Jody l/n/u (white), approached Plaintiff and told him to get out of the machine.

22.      Plaintiff asked Jody what the problem was and why Plaintiff had to stop working in the front loader.

23.      Jody then informed Plaintiff that Plaintiff was working too slowly.

24.      Plaintiff complied with Jody's request to exit the machine.

25.      As Plaintiff exited the machine, Jody said, "I don't even know why they hire *you type of people*."

26.      Because Plaintiff had not known Jody prior to this day, Plaintiff understood Jody to be referring to African Americans since he knew nothing else about Plaintiff.

27.      Later that day, Plaintiff complained to both of his supervisors, Matt Elliott, Project Supervisor, and Jared Peterson, Lead Operator.

28.      Plaintiff complained to his supervisors that Jody had made a racist comment directed at Plaintiff.

29.      In response to Plaintiff's complaint, Elliott responded "That's Jody, he's kind of an asshole, don't even worry about him."

30.      Similarly, Peterson responded, "Jody is just a dick, don't worry about Jody."

31.      Approximately two weeks after Plaintiff began working for Defendant, Plaintiff was riding in one of Defendant's vehicles with Jacob Morey.

32.      Morey was noticeably upset, and Plaintiff asked him what was wrong.

33.      Morey began explaining that he was frustrated with other employees of Defendant.

34.     Plaintiff asked Morey what the employees were doing that was making him so frustrated.

35.     Morey replied, "They are ignorant. *Motherfuckers are acting like niggers.*"

36.     In total disbelief of what he had heard, Plaintiff replied simply, "wow."

37.     Upon arriving back at Defendant's shop facility (the "Shop") for lunch, Plaintiff found Elliott and reported Morey's racial slur.

38.     Plaintiff explained to Elliott that Morey's comment really bothered Plaintiff, as he was the only African-American worker in the Department.

39.     Plaintiff reiterated to Elliott that the racists slurs appear to be ongoing issue with the predominately-white workforce in the Department.

40.     Elliott responded that he would talk to Morey.

41.     Elliott continued that Morey's use of the slur "probably wasn't meant like that."

42.     Elliott finished by concluding that "Jake is a good guy."

43.     Plaintiff was unsure what Elliott meant when he said that Morey's obviously racist statement "wasn't meant like that."

44.     Plaintiff also did not believe Elliott was appreciating the seriousness of the racist behavior and was, instead, making excuses for the employees' behavior.

45.     In or about the end of February 2020, Plaintiff was walking into the Shop when he noticed approximately six white employees of Defendant standing around talking.

46.     As Plaintiff walked into the Shop, Shawn Bauswell, the Noxious Weed Crewman Lead, shouted at Plaintiff: "Wassup my nigga!"

47.     The men standing around Bauswell chuckled and looked at Plaintiff in

anticipation for his response.

48.     Plaintiff shook his head in disapproval and removed himself from the situation.

49.     Approximately an hour later, Plaintiff was discussing daily tasks with Elliott and said: "I don't know what's wrong with Shawn, but he said the 'N' word to me when I was walking into the shop."

50.     Plaintiff told Elliot directly: "It is not okay for him to say that word to me."

51.     Elliott was again dismissive of the open use of racial slurs for African-Americans.

52.     Elliott responded: "Shawn just runs his mouth a lot and tries to make himself feel like the cool guy, don't let it get under your skin."

53.     Plaintiff was very put off by Elliott's suggestion that Plaintiff not let a comment based on his race "get under [his] skin."

54.     Bauswell continued to use the same phrase directed at Plaintiff throughout Plaintiff's employment with Defendant.

55.     This routinely was done in front of several coworkers and nearly always resulted in open laughter as Plaintiff reacted negatively to the slur.

56.     In or about April 2020, Bauswell again used the slur while addressing Plaintiff.

57.     Plaintiff told Bauswell to stop using the slur.

58.     Plaintiff told Bauswell to not call or refer to Plaintiff using that slur or any other slur aimed at Plaintiff's race.

59.     Bauswell and those around him laughed at Plaintiff's opposition to this

behavior.

60.     Plaintiff made another complaint to Elliott about Bauswell using the slur while addressing Plaintiff.

61.     Plaintiff explained to Elliott what had transpired with Bauswell.

62.     Plaintiff complained that Bauswell not only routinely used the slur, but consistently did so while there were other employees of Defendant around and sure to hear it.

63.     Plaintiff explained that this was a very intimidating environment, with Plaintiff being the only African-American worker and nearly all his white coworkers partaking in or being dismissive of overt racial slurs being used toward Plaintiff.

64.     Elliott reiterated his previous advice that Plaintiff should not let it get under his skin.

65.     Despite these complaints to Elliott and direct requests to Bauswell himself to stop, Bauswell shouted "wassup my nigga" at least six more times throughout Plaintiff's employment with Defendant, and always in the presence of at least one other white employee of Defendant.

66.     In or about the end of April or beginning of May, Plaintiff became aware of a "game" that his coworkers Jacob Morey, Jarrett Beach, and Tyler Michaud were playing.

67.     Plaintiff first became aware of the game when he was riding in one of Defendant's trucks with Morey and Beach.

68.     As Plaintiff was riding in the back seat, Morey began showing his cell phone to Beach.

69.     After doing so, the two men began laughing loudly.

70.     After this happened a couple of times, Plaintiff asked the men what was so funny.

71.     Morey turned the screen of his phone to show Plaintiff what they were laughing about.

72.     Morey had taken a picture of Plaintiff without Plaintiff knowing.

73.     Morey had then applied a filter which put a graphic of black sunglasses over Plaintiff's eyes, a joint in his mouth, and the words "Thug Life" in old English script at the top.

74.     This filter was popular on social media apps in early 2020, and would place the following items over pictures of individuals:



75.     As Morey showed the edited picture to Plaintiff, Morey yelled: "Look at this man! You look like Snoop Dogg!"

76.     Morey continued to laugh hysterically and shouted to Beach: "Snoop Dogg works with us!"

77.     Plaintiff told Morey that he did not think it was funny.

78.     Plaintiff also pointed out that, other than both men being African-American, Plaintiff did not physically resemble Snoop Dogg.

79.     Plaintiff then asked Morey not to take Plaintiff's picture without Plaintiff's permission in the future.

80.     Morey replied: "Okay, Snoop."

81.     Despite Plaintiff's request, the "Snoop Dogg game" continued throughout Plaintiff's employment.

82.     Plaintiff also was continually referred to as "Snoop" by his white coworkers despite Plaintiff's frequent protests and requests to not be called that.

83.     In early June 2020, Beach photographed Plaintiff while Plaintiff was digging with a shovel.

84.     Plaintiff noticed Beach taking the picture and asked him what he was doing.

85.     Beach laughed and said, "Just this, Snoop."

86.     Beach then showed Plaintiff the picture, which had the filter applied.

87.     Following this interaction, Plaintiff complained to Peterson.

88.     Plaintiff hoped that Peterson would have a better reaction than Elliott.

89.     Peterson seemed receptive.

90.     Peterson told Plaintiff that the matter would be "taken care of" and no other pictures would be taken.

91.     Despite this promise, Plaintiff was shown three other pictures which were all taken while Plaintiff was at work and to which this filter had been applied.

92.     Plaintiff would also learn that coworkers were sharing these pictures amongst one another on the social media app Snapchat.

93.     Learning of this, Plaintiff brought the issue to Elliott.

94.     Elliott agreed to verbally reprimand those involved in front of Plaintiff so Plaintiff knew "something had been done."

95.     Elliott called the men together and instructed that no one was to take pictures

of Plaintiff nor post any pictures of Plaintiff on social media.

96.     Elliott instructed that using cell phones in this way on the clock violated Defendant's cell phone use policy.

97.     Despite this instruction, the game continued throughout the summer of 2020.

98.     It escalated to videos being taken of Plaintiff, again with the filter applied.

99.     Morey took one such video and called to Plaintiff: "Wassup Snoop!"

100.    Morey then showed the video to Plaintiff.

101.    Plaintiff told Morey it was not funny the first time and was still not funny.

102.    Plaintiff asked Morey to stop taking photographs and videos of Plaintiff.

103.    In June 2020, Elliot, Peterson, and Plaintiff were discussing food that was served at a cookout that Elliott and/or Peterson had attended over the weekend.

104.    Elliott commented that Plaintiff "must love watermelon."

105.    Plaintiff replied that he actually didn't care for watermelon much.

106.    Both Elliott and Peterson laughed hysterically at this.

107.    Plaintiff asked what was so funny about that.

108.    Elliott responded: "What type of black person doesn't like watermelon?"

109.    Plaintiff found his *supervisors*' reliance on and referral to another African-American stereotype to be extremely offensive.

110.    Similarly, multiple times throughout Plaintiff's employment, coworkers would make references to Plaintiff liking fried chicken—another stereotype about African Americans.

111.    Additionally, throughout Plaintiff's employment, white employees often commented on Plaintiff listening to 103.3 FM, a hip-hop radio station.

112. The employees referred to this as "the Rodney station," even though other, white employees also listened to that station.

113. Plaintiff understood this to be a reference to Plaintiff's race because of the stereotype that African Americans only listen to rap and hip-hop music.

114. Plaintiff made multiple complaints to Elliott about this, explaining that it was a racially-charged nickname for the music station.

115. Elliott was extremely dismissive of this; often replying that it was true that Plaintiff liked to listen to that station.

116. During the summer of 2020, Plaintiff was also subjected to the least desirable assignments.

117. This included the manual digging positions, rather than equipment operating positions, during the hottest times of the year.

118. Plaintiff was also routinely assigned to be a flagger at a much greater frequency than any other worker.

119. In fact, of the ten projects to which Plaintiff was assigned, and for which a flagger was required, Plaintiff was given that assignment nine out of ten times.

120. Likewise, Plaintiff was assigned to perform hand digging on roughly two-thirds of jobs which required the task.

121. No other worker, including workers hired after Plaintiff, were required to do these least desirable tasks with the same frequency as Plaintiff.

122. Plaintiff felt demeaned and insulted by constantly being assigned the lowest-rung tasks, taking it as an indication that Defendant did not trust Plaintiff to operate machinery—the actual job he had been hired to perform.

123.   Plaintiff made multiple complaints to both Elliott and Peterson about Plaintiff's consistent assignment of the most difficult and least desirable tasks.

124.   Plaintiff also complained that the lack of meaningful rotation was limiting Plaintiff's ability to further train on and become proficient with the various heavy equipment he needed to operate in his role with Defendant.

125.   Each time Plaintiff brought this up, Elliott and/or Peterson gave Plaintiff the same response: Jarrett Beach, another operator, needed to get all available hours of training.

126.   Beach had been hired three days after Plaintiff.

127.   By Mid-August 2020, Beach had approximately 100 more hours of equipment operating time than Plaintiff.

128.   Plaintiff would not get any meaningful hours of equipment operating until around September 2020.

129.   In mid-summer 2020, a Lead position became available.

130.   Three employees applied: Plaintiff, Beach, and Dan l/n/u, a member of another crew.

131.   Dan ultimately withdrew his application.

132.   Plaintiff, prior to beginning employment with Defendant, had served in the United States Marine Corps.

133.   Plaintiff was charged with leading a crew of four to five Marines as a Motor Transport Operator.

134.   Plaintiff believed that this managerial experience gave him an edge over Beach, who had started three days after Plaintiff.

135.   Beach had no prior managerial experience.

136.    Further, Beach had no direct, prior experience with all the equipment utilized by Defendant's equipment operators.

137.    Plaintiff was not selected for the position.

138.    Plaintiff asked Elliott for any insight as to what caused Defendant to select Beach.

139.    Elliott replied that Beach's "interview was better."

140.    In an effort to be better prepared for future interviews, Plaintiff asked Elliott for specific things that he could have or should have done better in the interview.

141.    Elliott offered no specifics, instead repeating that Beach was "just better."

142.    In late summer 2020, Elliott and Peterson approached Plaintiff one morning.

143.    The two supervisors told Plaintiff that he was going to be assigned to remove some graffiti from a bridge.

144.    The two supervisors told Plaintiff that he "might" find the graffiti offensive.

145.    Plaintiff politely suggested that, if the graffiti "might" offend Plaintiff then perhaps another worker should be assigned.

146.    The two supervisors stated that they had "considered" other people but decided to select Plaintiff.

147.    Plaintiff asked why.

148.    The supervisors stated that they were really doing Plaintiff "a favor," because the cleanup had to take place on Saturday and thus Plaintiff would get paid an overtime rate for the work.

149.    Plaintiff agreed that he would do the assignment, but noted that having to work on his regular off day is not exactly "a favor."

150.    Plaintiff asked what was painted on the bridge.

151.    The supervisors stated they didn't want to repeat it, just that they felt they should warn Plaintiff.

152.    When Plaintiff arrived, he found that the words "Nigger" and "Blacks Go Home" were spray painted on the bridge.

153.    Plaintiff became extremely upset that Elliott and Peterson had selected him, one of only two African-American employees, to clean this racist and offensive graffiti on his regular day off.

154.    Plaintiff completed the assignment and removed the graffiti from the bridge.

155.    In early September 2020, Plaintiff was in the parking lot of the Shop preparing to head out to his assigned worksite.

156.    Plaintiff was standing around with about seven to eight of his coworkers, all of whom were white males.

157.    Another employee, John Wilbourn (white), walked up to the group of men.

158.    Wilbourn walked directly to Plaintiff and stopped.

159.    Wilbourn said to Plaintiff: "Hey, Halloween is coming up. You know what you should do for Halloween?"

160.    Plaintiff asked, "What?"

161.    Wilbourn responded: "You should shove a 2x4 up your ass and call yourself a fudge-cicle!"

162.    Wilbourn and all but one of the white male employees began laughing.

163.    Kyle Hopkins, the lone white coworker who did not laugh, told Wilbourn that the comment was not funny.

164.   At the end of that shift, Plaintiff again made a complaint about the racial discrimination he was experiencing.

165.   Having gotten no results from his complaints to Elliott and Peterson, Plaintiff opted to go to the Road and Bridge Superintendent of Public Works, Vincent Grier.

166.   Grier is also an African-American male.

167.   Plaintiff hoped that Grier would be more sympathetic to what Plaintiff was experiencing.

168.   Plaintiff recounted what had occurred with Wilbourn that morning.

169.   Plaintiff also explained how he felt this was just one instance in a long list of racial discrimination he had experienced working for Defendant.

170.   Hopkins saw Grier and Plaintiff talking.

171.   Hopkins came up and asked if they were discussing what Wilbourn had said that morning.

172.   Hopkins told Grier what he had seen, confirming Plaintiff's account of what had occurred.

173.   Grier told Plaintiff that Grier would talk to Wilbourn about the incident.

174.   Wilbourn would continue to work in his position until, at least, Plaintiff's discharge on April 15, 2021.

175.   In November or December 2020, Plaintiff was again greeted with the phrase "wassup my nigga."

176.   In this instance, it was said by Jennifer l/n/u, a white female.

177.   Despite Plaintiff explaining that he did not like to be called that or greeted in

such a way, Jennifer would repeat the phrase approximately four times during the winter of 2020.

178.    Plaintiff made two complaints to Elliott and Peterson about Jennifer's use of the phrase.

179.    Each time, Elliott and/or Peterson ensured Plaintiff that Jennifer would be "talked to" about using the phrase.

180.    Plaintiff's supervisors never ever actually spoke to Jennifer about her use of the racial slur.

181.    Plaintiff believes this to be true because Jennifer continued to call Plaintiff a "nigga" after each of Plaintiff's complaints about Jennifer using the word.

182.    Plaintiff continued to experience this type of near-daily harassment from his coworkers and did so up until his discharge from employment on April 15, 2021.

183.    While working for Defendant, Plaintiff, and his coworkers, were often assigned tasks that required the use of chainsaws.

184.    When operating a chainsaw, Defendant's employees were, at some point, instructed to wear protective cloth chaps.

185.    However, throughout Plaintiff's employment, Defendant did not have adequate chaps available.

186.    The chaps that were available were in extreme sizes (XXL) or had broken buckles.

187.    Thus, the chaps available were either: too big or not functional for Plaintiff and most other employees of Defendant.

188.    As a result, Defendant's supervisors did not require Plaintiff or his

coworkers to don the chaps prior to working with the chainsaws.

189.    Prior to April 15, 2021, Plaintiff had made a complaint to Elliott that the chaps available were either broken or in sizes that did not fit Plaintiff's frame.

190.    On April 15, 2021, Plaintiff was assigned to remove tree limbs from Defendant's property using a chainsaw.

191.    That day, Plaintiff was working with Crew Lead Peterson.

192.    Jeff Lee, the Assistant Superintendent, was also at the site, briefly, to talk to Plaintiff and Peterson and to supervise.

193.    Plaintiff was working without chaps, operating a chainsaw while Lee was present.

194.    Plaintiff was working without chaps, operating a chainsaw, for several hours in the presence of his supervisor Peterson.

195.    Neither man required Plaintiff to don chaps before he operated the chainsaw.

196.    Neither man said anything to Plaintiff about not having chaps.

197.    Both men were well aware of the fact that Defendant did not have adequate, functional chaps.

198.    At approximately 2:00 p.m., Plaintiff and Peterson working on cutting a limb from a tree.

199.    Peterson was pulling downward on the limb, and he instructed Plaintiff to cut the limb with the chainsaw at a certain point.

200.    Plaintiff did as instructed, completing roughly half the cut.

201.    At that point, the limb snapped and dropped violently causing the other end of the body of the limb to swing into Plaintiff.

202.    The limb knocked Plaintiff off balance and knocked the chainsaw from Plaintiff's hand.

203.    As the chainsaw fell, the chain struck Plaintiff's right leg, cutting into Plaintiff's leg just below his kneecap.

204.    Plaintiff began bleeding profusely from his wound.

205.    Peterson summoned an ambulance and contacted Elliott and Grier.

206.    Elliott arrived at the scene shortly after the accident occurred.

207.    With Elliot and Peterson present, Plaintiff had a phone conversation with Grier with the phone on speaker mode.

208.    Grier asked what happened.

209.    Plaintiff answered and provided the details of how the accident happened.

210.    Plaintiff explained to Grier that Plaintiff was afraid he would be fired because he got hurt.

211.    Grier told Plaintiff not to worry.

212.    Grier told Plaintiff that "accidents happen."

213.    After the phone call ended, Elliott repeated Grier's message that Plaintiff did not need to worry about losing his job and that accidents happen.

214.    Plaintiff was transported to KU Hospital in Kansas City, Kansas.

215.    Plaintiff underwent surgery to repair the damage to his right leg.

216.    Approximately eight hours after surgery, Plaintiff was lying in his hospital bed recovering from the procedure.

217.    Plaintiff's phone rang, and he answered.

218.    Grier was on the line.

219.    Grier informed Plaintiff that Defendant had discharged Plaintiff from employment.

220.    Grier told Plaintiff he was being fired for violating Defendant's safety policy specifically failing to wear the cloth chaps.

221.    Grier told Plaintiff that the discharge was not his decision.

222.    Grier told Plaintiff that "Mike made the call."

223.    Plaintiff does not know who "Mike" is.

224.    Plaintiff told Grier that the only reason Plaintiff was not wearing chaps was because all available chaps were either broken or way too large for Plaintiff.

225.    Plaintiff told Grier that Plaintiff had repeatedly pointed this fact out to Elliott and Peterson prior to April 15, 2021.

226.    Plaintiff also told Grier that he had seen many of his coworkers use chainsaws without chaps, and none of those employees got so much as a verbal warning.

227.    Mike Reynolds, a white male employee of Defendant, suffered a nearly identical injury to Plaintiff in 2020.

228.    Reynolds cut his leg with a chainsaw and was not wearing chaps at the time of the injury.

229.    Reynolds had to miss approximately six weeks of work recovering from his injury.

230.    Upon information and belief, Reynolds did not opt to seek treatment through work comp but, instead, used his own health insurance.

231.    Reynolds was not discharged from employment.

232.    In fact, Reynolds was not even disciplined.

233.    All actions or inactions of or by Defendant occurred by or through its agents, servants, or employees, acting within the course and scope of their employment, as set forth herein.

## COUNT I - RETALIATION IN VIOLATION OF PUBLIC POLICY
## (KANSAS WORKER'S COMPENSATION ACT)

234.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 233 of his Complaint, as though fully stated herein.

235.    Plaintiff exercised rights granted by the Kansas Worker's Compensation Act.

236.    These rights included, but are not limited to, reporting a work-related injury, receiving medical treatment, and seeking other workers' compensation benefits.

237.    Defendant took adverse actions against Plaintiff, including but not limited to discharging Plaintiff from employment.

238.    Defendant had direct knowledge of the conduct for which it claims to have discharged Plaintiff prior to Plaintiff being injured.

239.    Defendant did not discipline, reprimand, or correct Plaintiff's conduct until Plaintiff was injured as work.

240.    Defendant did not discharge another employee who committed the same conduct but opted to not exercise his workers' compensation right to medical treatment.

241.    Defendant did not even discipline this employee for the identical conduct for which Defendant is claiming to have discharged Plaintiff.

242.    Defendant failed to discipline the supervisorial employees who violated the same safety policy for which Plaintiff was discharged despite violating the policy themselves by failing to require that Plaintiff don the required safety equipment prior to

working with the chainsaw while watching Plaintiff prepare to engage and engaging in the operation of the chainsaw on April 15, 2021 and throughout Plaintiff's employment.

243.    Thus, Defendant directly admits that Plaintiff's work-related injury motivated Defendant to discharge Plaintiff.

244.    Defendant's adverse actions taken against Plaintiff were each based upon, and directly related to, Plaintiff exercising his rights granted by the Kansas Worker's Compensation Act.

245.    Defendant's adverse actions against Plaintiff violate State public policy clearly declared by the Kansas Courts and the Kansas Legislature.

246.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered irreparable injury, including past and future pecuniary losses, emotional pain, suffering, humiliation, inconvenience, mental anguish, loss of enjoyment of life, reduced employment opportunities, and will continue to suffer the same unless and until this Court grants relief.

247.    Defendant acted toward Plaintiff with willful conduct, wanton conduct, and/or malice.

248.    Thus, an award of punitive and exemplary damages is appropriate.

WHEREFORE, Plaintiff prays for judgment against the above-named Defendant in an amount totaling or exceeding the statutory cap of $500,000; for punitive damages; for the costs of this action; and for such other and further consideration and relief as the Court may deem just and equitable.

## COUNT II - RACE DISCRIMINATION (HOSTILE WORK ENVIRONMENT) IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT

249.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 248 of his Complaint, as though fully stated herein.

250.    Plaintiff is African American.

251.    During his employment with Defendant, Plaintiff was subjected to adverse treatment of a continuing nature.

252.    This conduct, by and through both non-supervisory and supervisory employees of Defendant, created an intimidating, hostile, and/or offensive work environment.

253.    This conduct was part of a larger pattern and practice of discrimination against African-American employees.

254.    Defendant was aware of this conduct, but failed to take prompt remedial action to correct and prevent this known harassment.

255.    A/the motivating factor in this conduct taken by Defendant with respect to Plaintiff's employment was Plaintiff's race.

256.    This harassment was not an isolated incident, but a severe and pervasive pattern of hostility that impacted terms, conditions, and privileges of Plaintiff's employment, including but not limited to:

      a.    Preventing Plaintiff from receiving proper training;

      b.    Interfering with Plaintiff's ability to concentrate during his assigned work;

      c.    Preventing Plaintiff from gaining necessary experience required to

perform all aspects of his job proficiently; and

    d.    Depriving Plaintiff of a workplace free from racial discrimination.

257.    This discrimination was so severe that it rendered Plaintiff's working conditions objectively intolerable.

258.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered irreparable injury, including past and future pecuniary issues, loss of employment opportunities, emotional pain, suffering, humiliation, inconvenience, mental anguish, and loss of enjoyment of life, and will continue to suffer the same unless and until this Court grants relief.

259.    Defendant acted toward Plaintiff with willful conduct, wanton conduct, or malice.

260.    Plaintiff is also entitled to recover all of his costs, expenses, expert witness fees, and attorneys' fees incurred in this matter.

WHEREFORE, Plaintiff prays for judgment against the above-named Defendant in an amount totaling or exceeding the statutory cap of $300,000; for the costs of this action; for attorneys' fees; for the equitable relief of front pay; and for such other and further consideration and relief as the Court may deem just and equitable.

### COUNT III - RACE DISCRIMINATION
### IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT

261.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 260 of his Complaint, as though fully stated herein.

262.    Plaintiff is African American.

263.    Defendant took adverse employment actions against Plaintiff, including but

not limited to failing to promote Plaintiff, giving Plaintiff the least desirable jobs, refusing to give Plaintiff adequate training, subjecting Plaintiff to a hostile work environment, and discharging Plaintiff from employment.

264.    A/the motivating factor in these adverse actions taken by Defendant with respect to Plaintiff's employment was Plaintiff's race.

265.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered irreparable injury, including past and future pecuniary issues, loss of employment benefits, loss of employment opportunities, emotional pain, suffering, humiliation, inconvenience, mental anguish, and loss of enjoyment of life, and will continue to suffer the same unless and until this Court grants relief.

266.    Defendant acted toward Plaintiff with willful conduct, wanton conduct, or malice.

267.    Plaintiff is also entitled to recover all of his costs, expenses, expert witness fees, and attorneys' fees incurred in this matter.

WHEREFORE, Plaintiff prays for judgment against the above-named Defendant in an amount totaling or exceeding the statutory cap of $300,000; for the costs of this action; for attorneys' fees; for the equitable relief of front pay; and for such other and further consideration and relief as the Court may deem just and equitable.

## COUNT IV - RETALIATION IN VIOLATION OF THE CIVIL RIGHTS ACT

268.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 267 of his Complaint, as though fully stated herein.

269.    Plaintiff made internal complaints of actions prohibited by the Civil Rights Act.

270.    These   complaints   were   made   to   Plaintiff's   supervisors   and   the Superintendent of Plaintiff's Department.

271.    Defendant took adverse actions against Plaintiff.

272.    These adverse actions included, but are not limited to:

a.    Refusing to promote Plaintiff;

b.    Refusing to provide Plaintiff adequate training;

c.    Assigning Plaintiff the most physically demanding tasks;

d.    Assigning Plaintiff the least desirable tasks;

e.    Mocking Plaintiff; and

f.    Discharging Plaintiff from employment.

273.    A/the motivating factor in these adverse actions taken by Defendant with respect to Plaintiff's employment was Plaintiff's complaints about activity prohibited by the Civil Rights Act.

274.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered irreparable injury, including past and future pecuniary issues, loss of employment benefits, loss of employment opportunities, emotional pain, suffering, humiliation, inconvenience, mental anguish, and loss of enjoyment of life, and will continue to suffer the same unless and until this Court grants relief.

275.    Defendant acted toward Plaintiff with willful conduct, wanton conduct, or malice.

276.    Plaintiff is also entitled to recover all of his costs, expenses, expert witness fees, and attorneys' fees incurred in this matter.

WHEREFORE, Plaintiff prays for judgment against the above-named Defendant in an

amount totaling or exceeding the statutory cap of $300,000; for the costs of this action; for attorneys' fees; for the equitable relief of front pay; and for such other and further consideration and relief as the Court may deem just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff requests a trial by jury in the United States District Court for the District of Kansas to be held in Kansas City, Kansas, on all counts and allegations of wrongful conduct alleged in this Complaint.

Respectfully submitted,

 /s/ Daniel L. Doyle
Daniel L. Doyle, KS Bar No. 11260
Robert A. Bruce, KS Bar No. 28332
Noah D. Ballard, KS Bar No. 28871
DOYLE & ASSOCIATES LLC
748 Ann Avenue
Kansas City, Kansas  66101
(913) 371-1930
(913) 371-0147  Facsimile
Dan@KCLaw.com
Robert @KCLaw.com
Noah@KCLaw.com
**ATTORNEYS FOR PLAINTIFF**